UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION,<br><br>               Plaintiff,<br><br>       v.<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>            Defendants. | 19 Civ. 11311 (JSR) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JENNIFER C. SIMON
Assistant United States Attorney
     *Of Counsel*

i

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY .................................................................2

    A.   CBP's FOIA Division ................................................................................2

    B.   Plaintiff's FOIA Request and Defendants' Responses ..................................3

        1.   May 19, 2017 FOIA Request ................................................................3

        2.   CBP's Search for Records and Responses to the FOIA Request............5

        3.   ICE's Responses to the FOIA Request ..................................................8

ARGUMENT ..........................................................................................................................9

    A.   Legal Standard ................................................................................9

    B.   CBP Conducted an Adequate Search ................................................10

        1.   Applicable Legal Standards ................................................................10

        2.   CBP's Search for Responsive Records Was Reasonable and Adequate ..............11

    C.   DHS Properly Applied the Relevant Exemptions to the Referred Documents..........12

        1.   DHS Properly Applied FOIA Exemption 7(E)....................................13

        2.   DHS Properly Applied FOIA Exemption 5 .........................................17

CONCLUSION......................................................................................................................20

TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*ACLU v. DOJ,*
  844 F.3d 126 (2d Cir. 2016)..................................................................... 20

*ACLU v. NSA,*
  925 F.3d 576 (2d Cir. 2019)..................................................................... 20

*Adamowicz v. I.R.S.,*
  552 F. Supp. 2d 355 (S.D.N.Y. 2008)....................................................... 11

*Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.,*
  626 F.3d 678 (2d Cir. 2010)............................................................... 14, 15

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................................. 10

*Assadi v. U.S. Dep't of State,*
  No. 12 Civ. 1111 (LLS), 2014 WL 4704840 (S.D.N.Y. Sept. 22, 2014) ................ 13

*Bishop v. Dep't of Homeland Sec.,*
  45 F. Supp. 3d 380 (S.D.N.Y. 2014).......................................................... 14

*Blackwell v. FBI,*
  646 F.3d 37 (D.C. Cir. 2011) .................................................................... 15

*Brennan Center for Justice at NYU School of Law v. DHS,*
  331 F. Supp. 3d 74 (S.D.N.Y. 2018).......................................................... 15

*Carney v. U.S. Dep't of Justice,*
  19 F.3d 807 (2d Cir. 1994)........................................................... 10, 11, 13

*Charles v. Office of the Armed Forces Med. Exam'r,*
  979 F. Supp. 2d 35 (D.D.C. 2013) ............................................................ 19

*CIA v. Sims,*
  471 U.S. 159 (1985).................................................................................... 9

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001)........................................................................................ 9

*Doherty v. DOJ,*
  775 F.2d 49 (2d Cir. 1985)........................................................................ 14

*Garcia v. U.S. Dep't of Justice*,
181 F. Supp. 2d 356 (S.D.N.Y. 2002) ........................................................................ 11

*Grand Cent. P'ship, Inc. v. Cuomo*,
166 F.3d 473 (2d Cir. 1999) .............................................................................. 9, 10

*Hopkins v. U.S. Dep't of Housing & Urban Dev.*,
929 F.2d 81 (2d Cir. 1991) ..................................................................................... 17

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ..................................................................................... 9, 13

*Judicial Watch, Inc. v. Export-Import Bank*,
108 F. Supp. 2d 19 (D.D.C. 2000) ........................................................................... 11

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
337 F. Supp. 2d 146 (D.D.C. 2004) ......................................................................... 14

*Keys v. Dep't of Homeland Sec.*,
510 F. Supp. 2d 121 (D.D.C. 2007) ......................................................................... 14

*Keys v. DOJ*,
830 F.2d 337 (D.C. Cir. 1987) ............................................................................... 14

*Long v. Office of Pers. Mgmt.*,
692 F.3d 185 (2d Cir. 2012) .................................................................................. 10

*Martin v. DOJ*,
488 F.3d 446 (D.C. Cir. 2007) ................................................................................. 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................ 10

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) .............................................................................. 15

*Maynard v. C.I.A.*,
986 F.2d 547 (1st Cir. 1993) ................................................................................. 11

*McKinley v. Board of Governors of Fed. Reserve Sys.*,
647 F.3d 331 (D.C. Cir. 2011) ................................................................................ 20

*N.Y. Civ. Liberties Union v. Dep't of Homeland Sec.*,
771 F. Supp. 2d 289 (S.D.N.Y. 2011) ...................................................................... 14

*N.Y. Times Co. v. U.S. Dep't of Justice*,
756 F.3d 100 (2d Cir. 2014) .................................................................................. 10

*N.Y. Times v. U.S. Dep't of Justice,*
  101 F. Supp. 3d 310 (S.D.N.Y. 2015) ................................................................... 10

*National Council of La Raza v. DOJ,*
  339 F. Supp. 2d 572 (S.D.N.Y. 2004) ................................................................... 20

*National Security Archive v. CIA,*
  752 F.3d 460 (D.C. Cir. 2014) ............................................................................... 20

*Nat'l Council of La Raza v. Dep't of Justice,*
  411 F.3d 350 (2d Cir. 2005) ................................................................................... 18

*New York Times Co. v. U.S. Dep't of Justice,*
  872 F. Supp. 2d 309 (S.D.N.Y. 2012) ................................................................... 10

*NLRB v. Sears, Roebuck & Co.,*
  421 U.S. 132 (1975) ................................................................................... 17, 18, 20

*Reliant Energy Power Generation, Inc. v. FERC,*
  520 F. Supp. 2d 194 (D.D.C. 2007) ...................................................................... 19

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,*
  421 U.S. 168 (1975) ............................................................................................... 18

*Reporters Committee for Freedom of the Press v. FBI,*
  236 F. Supp. 3d 268 (D.D.C. 2017) ...................................................................... 15

*Sack v. Dep't of Defense,*
  823 F.3d 687 (D.C. Cir. 2016) ............................................................................... 13

*Scotto v. Almenas,*
  143 F.3d 105 (2d Cir. 1998) ................................................................................... 10

*Shinnecock Indian Nation v. Kempthorne,*
  652 F. Supp. 2d 345 (E.D.N.Y. 2009) ................................................................... 19

*Tigue v. U.S. DOJ,*
  312 F.3d 70 (2d Cir. 2002) ............................................................................... 18, 19

*Vaughn v. Rosen,*
  484 F.2d 820 (D.C. Cir. 1973) ............................................................................... 13

*ViroPharma Inc. v. HHS,*
  839 F. Supp. 2d 184 (D.D.C. 2012) ...................................................................... 19

*Wilner v. NSA,*
  592 F.3d 60 (2d Cir. 2009) ..................................................................................... 13

Defendants United States Customs and Border Protection ("CBP") and United States

Immigration and Customs Enforcement ("ICE") (together, "Defendants"), by their attorney,

Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully

submit this memorandum of law in support of their motion for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure and in opposition to Plaintiff's motion for

summary judgment.

## PRELIMINARY STATEMENT

This case arises out of a FOIA request made to the Defendant agencies, CBP and ICE, by

Plaintiff American Civil Liberties Union, seeking records pertaining to use of cell site simulators

by CBP and ICE, principally in the context of immigration enforcement.  Cell site simulators

help law enforcement agents locate cellular devices if the unique identifiers of the cellular device

are known or, if the unique identifiers are not known, allow law enforcement agents to determine

the unique identifiers by collecting limited signaling information from devices in the vicinity of

the simulator.  Plaintiff challenges the adequacy of the search performed by CBP and challenges

the withholdings asserted as to four documents referred by ICE to DHS – as the entity

responsible for creating those documents – for processing.

First, CBP conducted a reasonable search of its records and determined that it had no

responsive records.  This is unsurprising.  Although an ICE agent operated a cell site simulator in

connection with a single CBP criminal investigation into a CBP employee's misconduct in 2017,

CBP does not itself possess or use cell site simulators.  The information contained in the U.S.

House of Representatives Committee on Oversight and Government Reform Report title "Law

Enforcement Use of Cell-Site Simulator Technologies: Privacy Concerns and

Recommendations," (December 16, 2016), upon by Plaintiff relies and which states that CBP

spent $2,500,000.00 on cell site simulators and that CBP is in possession of 33 cell site

simulators, is simply inaccurate.

In addition, with respect to the four documents that Plaintiff now challenges, which were redacted in part or withheld in full by DHS following the referral by ICE, the withholdings are consistent with FOIA Exemptions 5 and 7(E), 5 U.S.C. §§ 552(b)(5), (b)(7)(E).

Accordingly, the Court should deny Plaintiff's motion for summary judgment and grant summary judgment in favor of the Defendant agencies.

## BACKGROUND AND PROCEDURAL HISTORY

### A.   CBP's FOIA Division[1]

CBP's FOIA Division is responsible for reviewing FOIA requests, determining whether responsive records exist and, if so, determining whether such records can be released in accordance with the FOIA.  *See* Declaration of Patrick A. Howard, dated June 12, 2020 ("Howard Decl."), ¶ 6.  In processing such requests, the FOIA Division consults with CBP component agencies, CBP personnel and, when appropriate, with other components within DHS, as well as other Executive Branch agencies.  *Id.*  The FOIA Division currently consists of 27 full-time staff and FOIA processors, 9 FOIA assistants, and 4 supervisory employees.  *Id.* ¶ 7. During fiscal year 2019, the FOIA Division processed 88,230 FOIA requests.  *Id.* ¶ 10.

Where the FOIA Division has no direct access to records that may be responsive to a request, it must determine which CBP component offices are likely to have responsive information and work with those offices to gather any potentially responsive records.  *Id.* ¶ 11. Based on the FOIA Division's familiarity, experience and knowledge with the types of records that each office maintains, an assessment is made as to where responsive records are likely to be

---

[1] Because Plaintiff challenges only the appropriateness of the withholdings in four documents referred by ICE to DHS for process, and does not challenge the adequacy of ICE's search, the Government does not address in detail the specifics of the processing, production, or withholding of records by ICE.

maintained based on a review of the content of the request itself and the nature of the records sought, as well as discussions with knowledgeable agency personnel. *Id.* When CBP receives a FOIA request that reasonably describes the records requested and complies with the agency's rules governing the procedures for FOIA requests, the office likely to have responsive information is tasked with searching for and retrieving potentially responsive records. *Id.* ¶ 11. As is relevant here, CBP is comprised of three law enforcement components: Office of Field Operations ("OFO"), United States Border Patrol ("USBP"), and Air and Marine Operations ("AMO"). *Id.* ¶ 15. In addition, there are a number of operational and policy offices within CBP, including the Office of Intelligence ("OI"), the Office of Professional Responsibility ("OPR"), and the Procurement Division ("Procurement"). *Id.* ¶ 16.

The CBP FOIA Division addresses a broad variety of FOIA requests. Approximately 85% of requests received are internally referred to as "traveler" requests, from individuals or their registered representatives asking for records of entry and exit, records of inspection, apprehension, etc. The requests are focused on the activities of a single person, or multiple persons/family and are processed internally within CBP FOIA Division, with no other office involvement. *Id.* ¶ 12. The remaining 15% of requests are internally referred to as "Non Traveler" requests and essentially encompass anything that does not fall into the first category. A frequent characteristic of Non Traveler requests is the need for the CBP FOIA Division to reach out to other offices for records, as CBP FOIA Division does not have access to all systems within CBP. *Id.* ¶ 13.

**B.      Plaintiff's FOIA Request and Defendants' Responses**

**1.      May 19, 2017 FOIA Request**

On or about May 19, 2017, Plaintiff submitted an electronic FOIA request for copies of records "pertaining to use of cell site simulators by Immigration and Customs Enforcement

3

('ICE') and Customs and Border Protection ('CBP')."  Compl. Exh. A. (Dkt. No. 1-1).  Within

that broad request, Plaintiff specified that they requested the following 10 categories of records:

(1)      Any policy directives, guidance documents, memoranda, training
materials, or similar records created on or after October 19, 2015, governing or
concerning use of cell site simulators by Immigrations and Customs Enforcement
and Customs and Border Protection agents, employees, or partners, including
any policy or guidance document that cites Department of Homeland Security
Policy Directive 047-02 ("Department Policy Regarding Use of Cell- Site
Simulator Technology"), as well as any communications with Congress
concerning implementation of or updates to DHS Policy Directive 047-02 and
other policies governing cell site simulator use;

(2)      Any records reflecting whether ICE or CBP does use or is permitted to
use cell site simulators in furtherance of civil immigration enforcement
operations, as opposed to in furtherance of criminal investigations, and any
guidance concerning whether and how DHS Policy Directive 047-02 applies to
uses of cell site simulators in furtherance of immigration-related investigations
that are not criminal in nature;

(3)      From October 19, 2015 to the present, annual records reflecting the total
number of times a cell-site simulator is deployed in the jurisdiction of each field
office, the numbers of deployments at the request of other agencies, and the
number of times the technology is deployed in emergency circumstances
(collection of this information is required by DHS Policy Directive 047-02);

(4)      Since the date of the last annual record described in item 3, above,
records reflecting the number of ICE and CBP investigations or operations in
which cell site simulators have been deployed, including information about the
field office deploying the cell site simulator and whether those deployments were
in support of criminal investigations of non- immigration-related offenses,
criminal investigations of immigration-related offenses, or civil immigration
enforcement operations;

(5)      Records reflecting the number of times ICE and CBP have requested the
assistance of other law enforcement agencies (including federal, state, local, and
foreign) in deploying cell site simulators;

(6)      Records regarding implementation of an auditing program to ensure
deletion of data collected by cell site simulators, as required by DHS Policy
Directive 047-02;

(7)      All applications submitted to state and federal courts since January 1,
2013, for orders or search warrants authorizing the use of cell site simulators in
ICE and CBP investigations or operations (including investigations or operations
as part of task forces or partnerships with other agencies), as well as any
warrants or orders, denials of warrants or orders, and returns of warrants

associated with those applications. If any responsive records are sealed, please provide the date, court, and docket number for each sealed document;

(8)     All requests to persons or offices within the Department of Homeland Security for supervisory or legal authorization to deploy cell site simulators;

(9)     Records dated or created on or after January 1, 2013 concerning the purchase of cell site simulator equipment and related software and hardware, including purchase orders, invoices, documentation of selection, sole source or limited source justification and approval documentation, communications, and other memoranda and documentation. This should include any purchase of cell site simulator equipment from the Harris Corporation (including, but not limited to, Stingray, Stingray II, Hailstorm, Triggerfish, Kingfish, Amberjack, and Harpoon devices), DRT (also known as Digital Receiver Technology), and other companies. At a minimum, please search the ICE Office of Acquisition Management for these record; and

(10)    Records concerning the use of evidence derived or resulting from use of a cell site simulator in immigration court proceedings, and the provision of notice to respondents in immigration court proceedings informing them that a cell site simulator was used.

*Id.* at 3-4.

### 2.     CBP's Search for Records and Responses to the FOIA Request

Based on the expertise and experience of the FOIA Division, including that of Branch Chief of the FOIA Division Patrick Howard, following an initial review of the request, it was determined that the office most likely to maintain information responsive to the Request was OI.[2]  Howard Decl. ¶ 18.  On May 22, 2017, the FOIA unit submitted a request to the OI.  *Id.* ¶ 19.  The request was entered into the FOIA tasking system and sent electronically to OI, which was directed to conduct a search of records or information regarding the use of cell site simulators by CBP.  *Id.* On May 24, 2017, OI responded that the unit did not use the technology. *Id.* ¶ 20.  By letter dated, May 24, 2017, the FOIA unit sent Plaintiff a final response indicating

---

[2] As set forth on CBP's website, OI is a "coordinating facilitator that integrates CBP's diverse intelligence capabilities into a single cohesive intelligence enterprise." *See* Operations Support Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices/operations-support-assistant-commissioners-offices (last visited June 11, 2020).

that CBP was unable to locate or identify any responsive records, based upon the information provided in the Request.  *See* Compl. Exh C (Dkt. 1-3) at 4.

By letter dated June 19, 2017, Plaintiff submitted an Administrative Appeal of CBP's final response to their FOIA request, reiterating that the request "seeks copies of records pertaining to the use of cell site simulators by [ICE] and [CBP]."  *Id.* at 7.  In the appeal, Plaintiff asserted that "is not plausible that a 'comprehensive' search by CBP would fail to return responsive records."  *Id.*  Plaintiff pointed to a House Committee on Oversight and Government Reform Report, titled "Law Enforcement Use of Cell-Site Simulation Technologies: Privacy Concerns & Recommendations," and dated December 19, 2019 (the "House Committee Report"), asserting that the document "discloses that CBP possesses at least 33 cell site simulator devices."  *Id.* at 8-9.  Plaintiff further asserted that:

> At a minimum, CBP necessarily has records regarding the purchase of this equipment, which would be responsive to item 9 of the Request. . . .  Moreover, it is not plausible that CBP has never used its nearly three dozen cell site simulators, meaning that the agency would also have records responsive to the portions of the request covering deployment and use of the technology.  It is simply not credible that CBP possesses more than 30 cell site simulators but has zero records regarding their purchase and use.  An adequate search would have returned records responsive to the Request.

*Id.* at 9.

In response to Plaintiff's Administrative Appeal, CBP's FOIA Appeals Unit contacted all relevant CBP components to conduct a *de novo* search based upon information provided in the request.  Howard Decl. ¶ 24.  Specifically, on July 6, 2017, the FOIA Appeals Unit sent an email to the AMO FOIA contact person asking about the use of cell site simulators by CBP and whether or not AMO uses cell site simulators.  *Id.* ¶ 25.  On July 13, 2017, the AMO component responded that AMO does not use cell site simulators.  *Id.* ¶ 26.  On June 22, 2017, the FOIA Appeals Unit sent an email to the FOIA contact person for the USBP and OI asking if USBP or

OI use cell site simulators.  *Id.* ¶ 26.  On June 23, 2017, the FOIA contact person responded that the USBP does not use cell site simulators and they do not, nor have ever, possessed cell site simulators, nor does the OI use cell site simulators and they do not, nor have ever, possessed cell site simulators.  *Id.*

By letter dated, July 13, 2017, the FOIA Appeals Unit sent the Plaintiff a final response stating that the decision of the FOIA Division was affirmed.  *See* Compl. Exh C (Dkt. 1-3) at 27-28.  In particular, the FOIA Appeals Unit explained that a thorough *de novo* search had been conducted for responsive records, but there were no records responsive to the request.  *Id.*

On December 11, 2019, Plaintiff filed the instant action, asserting similar challenges to the adequacy of CBP's search.  In response, CBP again conducted a *de novo* search based upon the information provided in the request.  Howard Decl. ¶ 28.  Specifically, on or about January 22, 2020, the FOIA Division sent an email to the FOIA contact person in the Procurement Division. *Id.* ¶ 29.  The FOIA Division received confirmation that the Procurement division was not able to locate any cell site simulator contracts or anything related to it.  *Id.*  On or about January 22, 2020, the FOIA Division was again informed by the FOIA contacts in the USBP the USBP is not using this technology.  *Id.* ¶ 30.  On or about January 30, 2020, the FOIA Division called the Director of the Office of Intelligence.  *Id.* ¶ 32.  In an email addressed to the FOIA Division, the Director reported that the OPR does not have any equipment nor have they ever purchased any equipment that can perform as a cell site simulator.  *Id.*  On February 4, 2020, the FOIA Division sent a further email to the FOIA contact in the OPR unit regarding the FOIA request, and, on February 24, 2020 the FOIA contact sent an email to the FOIA unit stating that OPR is confident that OPR has no responsive records.  *Id.* ¶ 33.

By letter dated March 26, 2020, CBP advised Plaintiff that the CBP FOIA Division completed a supplemental search for records responsive to the request, and no responsive records

were identified.

### 3.     ICE's Responses to the FOIA Request

With respect to ICE, after the commencement of this action, the Court directed ICE to make an initial production of records by no later than March 3, 2020. *See* Dkt. No. 19. The Court subsequently granted ICE's request for an extension until April 2, 2020. On March 4, 2020, ICE release in full or in part 1094 pages of responsive records to Plaintiff. In addition, ICE appropriately referred a small volume of documents responsive to Plaintiff's FOIA request to DHS – the entity responsible for creating those documents – for processing. DHS, which is not a party to this litigation, processed the pages in question and a further 95 pages were produced to Plaintiff on May 21, 2020. Certain of these documents were withheld in full and redacted in part, consistent with, *inter alia*, FOIA Exemptions 5 and 7(E), 5 U.S.C. §§ 552(b)(5), (b)(7)(E). Plaintiff does not challenge ICE's search or any of the withholdings or redactions asserted ICE's initial productions. Rather, Plaintiff has indicated they challenge a subset of the withholdings asserted by DHS in the documents referred to that agency.

Specifically, Plaintiff indicated it only challenges the following withholdings:

i.      Document 1: Redactions pursuant to FOIA exemption 7(E) applied to a set of slides titled "Cellular Threats." Specifically, Plaintiff challenges the redactions on pages bates-stamped 1146, 1148-50, 1152-53, 1157-59, and 1163-67.

ii.     Document 2: Redactions pursuant to FOIA exemption 7(E) applied to a letter to Senator Wyden from DHS. Specifically, Plaintiff challenges the first two redactions on the page bates-stamped 1168, and the one redaction on the page bates-stamped 1169.

iii.    Document 3: Redactions pursuant to FOIA exemption 7(E) in a letter to Senator Franken from DHS. Specifically, Plaintiff challenges the one redaction on the page bates-stamped 1171 and the first redaction bates-stamped 1174.

iv.     Document 4: A draft report to Congress fully withheld under FOIA exemption 5 and bates-stamped 1176-85.

On May 22, 2020, Plaintiff filed a motion for summary judgment challenging the adequacy of CBP's search and reserving its right to challenge the withholdings in the documents processed by DHS and produced to Plaintiff on May 21, 2020.

ARGUMENT

**A.    Legal Standard**

Congress's purpose in enacting FOIA was "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-147 at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).  Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see also Martin v. DOJ*, 488 F.3d 446, 453 (D.C. Cir. 2007) ("Recognizing, however, that the public's right to information was not absolute and that disclosure of certain information may harm legitimate governmental or private interests, Congress created several exemptions to FOIA disclosure requirements."); *John Doe Agency*, 493 U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application").

FOIA generally requires federal agencies to make records and other materials "available to the public," *see* 5 U.S.C. § 552(a), on the basis of an adequate search "reasonably calculated to discover the requested documents." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 489 (2d Cir. 1999). The Government must also ensure that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which

9

are exempt under this subsection." 5 U.S.C. § 552(b).

Summary judgment is the preferred procedural vehicle by which most FOIA claims are resolved. *N.Y. Times v. U.S. Dep't of Justice*, 101 F. Supp. 3d 310, 317 (S.D.N.Y. 2015); *see also Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) ("In resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of other documentary or testimonial evidence . . . .");[3] *see also e.g.*, *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment is warranted if a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party, however, may not rely solely on "conclusory allegations or unsubstantiated speculation" to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

**B.    CBP Conducted an Adequate Search**

**1.    Applicable Legal Standards**

A search is judged by the efforts the agency undertook, not by its results. *See Grand Cent. P'ship, Inc.*, 166 F.3d at 489. In other words, the agency must simply demonstrate that its search was "reasonably calculated to discover the requested documents." *Id.*; *see also N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 124 (2d Cir. 2014) ("The adequacy of a search is not measured by its results, but rather by its method."). The search "need not be perfect, but rather

---

[3] Defendants have not submitted a Local Rule 56.1 statement. "The general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment," and Local Civil Rule 56.1 statements are not required." *New York Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (internal quotations marks and alterations omitted).

need only be reasonable," *Grand Cent. P'ship*, 166 F.3d at 489, because "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters." *Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 27 (D.D.C. 2000). Provided it is properly designed, an agency's search may be reasonable even if it does not return every responsive document. *See Adamowicz v. I.R.S.*, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008). "If an agency demonstrates that it has conducted a reasonable search for relevant documents, it has fulfilled its obligations under FOIA and is entitled to summary judgment on this issue." *Garcia v. U.S. Dep't of Justice*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

An agency may satisfy its burden of demonstrating an adequate search through "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search." *Carney*, 19 F.3d at 812 (footnote omitted). Such declarations may be made by the individuals supervising each agency's search, rather than by each individual who participated. *Id.* at 814. Where an agency's declaration demonstrates that it has conducted a reasonable search, "the FOIA requester can rebut the agency's affidavit only by showing that the agency's search was not made in good faith." *Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993); *see also Carney*, 19 F.3d at 812. "[P]urely speculative claims about the existence and discoverability of other documents" are insufficient to overcome the good faith presumption. *Carney*, 19 F.3d at 813. Thus, a court may award summary judgment if the affidavits provided by the agency are "adequate on their face." *Id.* at 812.

### 2. CBP's Search for Responsive Records Was Reasonable and Adequate

CBP's search was reasonable and adequate because it tasked the program offices most likely to have responsive documents to search their systems and ultimately determined that CBP does not possess or use cell site technology. As detailed above, CBP has, to date, conducted a search for responsive records among all three law enforcement components, as well as the

relevant policy and operational offices noted above.  However, the CBP FOIA Division

ultimately verified that CBP does not itself possess or use cell site technology.  Specifically, the

House Committee Report appears to refer to technology owned by CBP that, while it

theoretically could be configured to operate as a cell site simulator, the devices owned by CBP

lack the necessary software or hardware.  *See* Declaration of Steven J. Griffin, dated June 12,

2020 ("Griffin Decl."), ¶¶ 7-8.

There is no merit to Plaintiff's argument that "CBP should be able to identify records

regarding the purchase or acquisition of the referenced equipment, which would be responsive to

Item 9 of Plaintiff's FOIA request," Pl. Mem. at 10, for the simple reason that CBP did not

purchase the 33 cell site simulators described in the House Committee report.  Griffin Decl. ¶ 6.

Similarly, and contrary to Plaintiff's assertions, it is not "fanciful to think that CBP has not used

[the 33 cell site simulators]," Pl. Mem. at 10, since CBP does not own any cell site simulators.

CBP did identify a single instance in which the Homeland Security Investigations

("HSI") component of ICE – *i.e.*, not CBP – deployed a cell site simulator in connection with a

CBP criminal investigation into a CBP employee's misconduct.  *See* Declaration of Erick Funn,

dated June 12, 2020 ("Funn Decl."), ¶ 7.  The investigation is ongoing and does not involve an

immigration matter.  *Id.*  Despite the assistance provided by HSI on this occasion and its search

for responsive records, OPR determined it had no responsive records.  Howard Decl. ¶ 33.

CBP's declarations demonstrate a reasonable search that is more than adequate.  For the

reasons given in the declarations and in the rest of the Government's papers, the Government's

motion for summary judgment as to the sufficiency of CBP's search should be granted.

**C.    DHS Properly Applied the Relevant Exemptions to the Referred Documents**

DHS properly applied the relevant FOIA exemptions in making the challenged

withholdings.  The FOIA Exemptions, each established by Congress in light of a compelling

countervailing interest to disclosure, are "intended to have meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

Here, DHS has invoked FOIA Exemptions 7(E) and 5.  The factual basis for an agency's withholdings is typically put forward in declarations by agency personnel, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), to enable a court to decide whether the exemptions were justified. *See, e.g.*, *Carney*, 19 F.3d at 812; *Assadi v. U.S. Dep't of State*, No. 12 Civ. 1111 (LLS), 2014 WL 4704840, at *2 (S.D.N.Y. Sept. 22, 2014).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (citation and internal quotation marks omitted).  DHS, through its declarant, has satisfied this standard for each of the asserted exemptions.

### 1.    DHS Properly Applied FOIA Exemption 7(E)

Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes" where disclosure would result in one of six enumerated harms set forth in 5 U.S.C. §§ 552(b)(7)(A)-(F).  "Exemption 7 uses the term 'law enforcement' to describe 'the act of enforcing the law, both civil and criminal.'"  *Sack v. Dep't of Defense*, 823 F.3d 687, 694 (D.C. Cir. 2016).  "Law enforcement" in this context extends to the Government's national security efforts. *See, e.g.*, *id.* (reports about polygraph use met Exemption 7 threshold because they "assist law enforcement agencies in taking 'proactive steps' to deter illegal activity and ensure national security").

Exemption 7(E) exempts from disclosure "records or information compiled for law enforcement purposes," release of which "[1] would disclose techniques and procedures for law enforcement investigations or prosecutions, or [2] would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  To show that information is "compiled for

13

law enforcement purposes," the Government need only demonstrate a "nexus between the agency's activity . . . and its law enforcement duties."  *Keys v. DOJ*, 830 F.2d 337, 340 (D.C. Cir. 1987).  The first clause of Exemption 7(E) provides categorical protection to information that would disclose law enforcement "techniques and procedures," without requiring any showing of harm as a result of disclosure.  5 U.S.C. § 552(b)(7)(E).[4]  "[T]he qualifying phrase ('if such disclosure could reasonably be expected to risk circumvention of the law') modifies only 'guidelines' and not 'techniques and procedures.'"  *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010).  Moreover, while Exemption 7(E) generally covers only "investigatory records that disclose investigative techniques and procedures not generally known to the public," *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985), "even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004); *see also Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014).  Where disclosure would reduce or nullify the effectiveness of investigative techniques and procedures, Exemption 7(E) provides "categorical protection," which means that it does not require any "demonstration of harm or balancing of interests." *Keys v. Dep't of Homeland Sec.*, 510 F. Supp. 2d 121, 129 (D.D.C. 2007) (internal quotation marks omitted).

Courts "set[] a relatively low bar for the agency to justify withholding" under Exemption 7(E).  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).  An agency does not have "a highly

---

[4] Notwithstanding the lack of need to make such a showing of harm, courts have recognized that the risk of harm in revealing such techniques, which are "not generally known to the public," is well established. *Doherty v. DOJ*, 775 F.2d 49, 52 & n.4 (2d Cir. 1985); *see also Bishop v. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014) (noting applicability where "the disclosure of additional details could reduce . . . effectiveness" of techniques); *accord N.Y. Civ. Liberties Union v. Dep't of Homeland Sec.*, 771 F. Supp. 2d 289, 292-93 (S.D.N.Y. 2011).

specific burden of showing how the law will be circumvented," but only must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (quotation marks and alterations omitted).

As relevant here, DHS withheld information that falls within the ambit of Exemption 7(E) law enforcement "techniques and procedures." *See Reporters Committee for Freedom of the Press v. FBI*, 236 F. Supp. 3d 268, 279 (D.D.C. 2017); *Brennan Center for Justice at NYU School of Law v. DHS*, 331 F. Supp. 3d 74 (S.D.N.Y. 2018); *Allard*, 626 F.3d at 681-82.

Specifically, as to Document 1, DHS applied FOIA Exemption 7(E) to withhold portions of the thirty-page slide presentation dated February 6, 2018 and titled "Cellular Threats." *See* Declaration of James V.M.L. Holzer, dated June 12, 2020 ("Holzer Decl."), ¶ 6. The document is a briefing on mobile wireless network vulnerabilities in the United States, and it discusses specific vulnerabilities and common strategies for hacking mobile wireless networks. *Id.* Among other things, the document contains details regarding vulnerabilities to mobile networks, including:

- Detailed explanations of the basis for exploits to hack mobile phone networks and explanations of how mobile phone networks could be brought down;

- A map portraying mobile network vulnerabilities in Massachusetts;

- A chart summarizing vulnerabilities detected in specific cellular carrier networks;

- Identification of a threat posed by rural wireless operators;

- A detailed account of Russian hacking of U.S. networks;

- A list of specific countries whose telecom assets have attacked U.S. mobile phone subscribers during the preceding six months;

- Identification of call interception services available on the dark web;

15

- Detailed descriptions of rogue cellular base stations in the National Capitol Region; and

- Examples of mobile phone network vulnerabilities that directly affect law enforcement and national security communications.

*Id.*

As described by the DHS declarant, revealing vulnerabilities in technology relied upon by law enforcement, and revealing nonpublic strategies used by law enforcement to conduct surveillance would both promote potential criminal violations and allow individuals to circumvent the law by modifying their activities to avoid detection.  *Id.*

As to Document 2, in which DHS asserted redactions pursuant to FOIA exemption 7(E) in a letter to Senator Wyden, DHS withheld portions that contain information about law enforcement techniques and procedures used by DHS.  Specifically, the disclosure of the redacted portions would reveal how the cell site technology works and under what instances the technology is used by DHS.  *Id.* ¶ 7.f  As above, the disclosure of this information and strategies would interfere with DHS ability to conduct some types of lawful surveillance and could allow individuals to circumvent the law by modifying their activities to avoid detection.  *Id.*

As to Document 3, in which DHS asserted redactions pursuant to FOIA exemption 7(E) in a letter to Senator Franken, DHS again withheld portions that contain information about law enforcement techniques and procedures used by DHS.  In this instance, the withholding protects law enforcement sensitive information regarding the vulnerabilities of wireless mobile networks. *Id.* ¶ 8.  The redacted information was collected for law enforcement purposes to assist in prevention of illegal intrusions into and manipulation of wireless mobile networks.  *Id.*  Law enforcement relies upon secure, reliable wireless mobile networks to conduct voice and data communications.  *Id.*  Exposure of network vulnerabilities will interfere with the effective

16

coordination of critical law enforcement operations.  *Id.*

In this case, DHS' supporting declaration establishes that disclosure of the withheld information in these three documents could reasonably be expected to jeopardize ongoing DHS investigations and operations and assist those seeking to violate or circumvent the law.  Such disclosure could assist those seeking to violate or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations, potentially interfering with ongoing ICE investigations and operations.

### 2.    DHS Properly Applied FOIA Exemption 5

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  *See* 5 U.S.C. § 552(b)(5).  With this exemption, "Congress specifically had in mind . . . the deliberative process or executive privilege, which protects the decision[-]making processes of the executive branch in order to safeguard the quality and integrity of governmental decisions."  *Hopkins v. U.S. Dep't of Housing & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991) (internal quotation marks omitted); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975) ("those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process" (quotation marks omitted)).

An agency document "may be withheld pursuant to the deliberative process privilege if it is: (1) 'predecisional,' *i.e.*, 'prepared in order to assist an agency decisionmaker in arriving at his decision,' and (2) 'deliberative,' *i.e.*, 'actually related to the process by which policies are formulated.'"  *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (citing *Grand Cent. P'ship*, 166 F.3d at 482) (internal quotation marks and alteration omitted).  A document is "predecisional" when it is "prepared in order to assist an agency decisionmaker in arriving at his decision."  *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184

(1975). The government need not "identify a specific decision" made by the agency to establish

the predecisional nature of a particular record, *Sears*, 421 U.S. at 151 n.18; *accord Tigue v. U.S.*

*DOJ,* 312 F.3d 70, 80 (2d Cir. 2002).  So long as the document "was prepared to assist [agency]

decisionmaking on a specific issue," it is predecisional.  *Id*.

  "A document is 'deliberative' when it is actually related to the process by which policies

are formulated." *Grand Cent. P'ship*, 166 F.3d at 482 (*quotation* marks and alteration omitted).

In determining whether a document is deliberative, courts inquire whether it "formed an

important, if not essential, link in [the agency's] consultative process," whether it reflects the

opinions of the author rather than the policy of the agency, and whether it might "reflect

inaccurately upon or prematurely disclose the views of [the agency]." *Id.* at 483; *accord*

*Hopkins*, 929 F.2d at 84. The privilege "focus[es] on documents 'reflecting advisory opinions,

recommendations and deliberations comprising part of a process by which governmental

decisions and policies are formulated.'" *Hopkins*, 929 F.2d at 84-85 (quoting *Sears*, 421 U.S. at

150).

  Here, DHS withheld in full a draft report to Congress pursuant to Exemption 5.  As set

forth by the agency's declarant, the document in question is a ten-page draft Report to Congress

for fiscal year 2017.  Holzer Decl. ¶ 9.  The document is titled "Use of International Mobile

Subscriber Identity (IMSI) Catcher Technology" and was drafted in response to Senate Report

114-264.  *Id.*  The document is a partial draft: only three of the five sections noted in the table of

contents are drafted, while two evidently remain undrafted.  *Id.*  The document is undated and

marked "Month XX, 2017" on multiple pages.  *Id.*

  The document thus falls into the category of "recommendations, draft documents,

proposals, suggestions, and other subjective documents which reflect the personal opinions of the

writer." *Tigue*, 312 F.3d at 80 (quoting *Grand Cent. P'ship*, 166 F.3d at 482).  Moreover, the

draft is deliberative, as the document reflects the efforts of DHS staff to set forth agency policies. *See Grand Central*, 166 F.3d at 482 (A document is deliberative if it "bear[s] on the formulation or exercise of policy-oriented judgment.") (quotation marks omitted).

As courts applying Exemption 5 have generally held, "draft documents do not contain reasonably segregable material, and thus are properly withheld in their entirety." *Charles v. Office of the Armed Forces Med. Exam'r*, 979 F. Supp. 2d 35, 43 (D.D.C. 2013) (citing cases); *see ViroPharma Inc. v. HHS*, 839 F. Supp. 2d 184, 193 (D.D.C. 2012) (requester was "incorrect when it argues that [the agency] must segregate and disclose the factual background . . . from the draft documents in this case" because "choice of what factual material and prior final agency opinions to include or remove during the drafting process is itself often part of the deliberative process, and thus is properly exempt under Exemption 5" (internal citation and quotation marks omitted)); *Shinnecock Indian Nation v. Kempthorne*, 652 F. Supp. 2d 345, 371 (E.D.N.Y. 2009) ("any differences between the [earlier draft] memorandum, if potentially disclosed in redacted form, and the second memorandum would only be non-cumulative to the extent that they revealed the evolution of the draft," but "such a disclosure would infringe upon the deliberative process privilege"); *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) ("An agency need not demonstrate the extent to which the draft differs from the final document because such a showing would expose what occurred in the deliberative process between the draft's creation and the final document's issuance." (quotation marks omitted)).

Moreover, it is of no moment if Plaintiff is not in possession of a final version of the draft report. Draft material that never becomes finalized is nonetheless protected by the privilege because the draft constitutes a part of an agency's decisionmaking process, even if it does not lead to a specified final agency decision. For instance, the Second Circuit has held that a "draft of a proposed op-ed article" that was "never published" was "a draft and for that reason

predecisional." *ACLU v. DOJ*, 844 F.3d 126, 133 (2d Cir. 2016).  Similarly, the D.C. Circuit

concluded that draft deliberative materials that were never finalized—that is, materials that "died

on the vine"—were "still pre-decisional and deliberative," regardless of whether they "actually

evolve[d] into final Executive Branch actions." *National Security Archive v. CIA*, 752 F.3d 460,

463 (D.C. Cir. 2014); *see National Council of La Raza v. DOJ*, 339 F. Supp. 2d 572, 583

(S.D.N.Y. 2004) ("Drafts and comments on documents are quintessentially predecisional and

deliberative.").

> Finally, as set forth in 5 U.S.C. § 552(a)(8), DHS "reasonably foresees that disclosure

would harm an interest protected" by Exemption 5.  Specifically, the disclosure of the draft

report would have a chilling effect on internal agency decisionmaking, and could cause public

confusion to the extent inconsistent with the agency's final decision on the matters described in

the report.  "[T]he deliberative process privilege promotes reasoned policy-making in general,"

because " 'the frank discussion of legal or policy matters in writing might be inhibited if the

discussion were made public,' and 'the decisions and policies formulated would be the poorer as

a result.' " *ACLU v. NSA*, 925 F.3d 576, 592 (2d Cir. 2019) (quoting *Sears*, 421 U.S. at 150).

Disclosure of *any* privileged material would harm those important government interests.

*McKinley v. Board of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 339 (D.C. Cir. 2011)

("Congress enacted FOIA Exemption 5 . . . precisely because it determined that disclosure of

material that is both predecisional and deliberative *does* harm an agency's decisionmaking

process.").

## CONCLUSION

> For the reasons stated herein, Plaintiff's motion for summary judgment should be denied,

and the Government's motion for summary judgment should be granted in its entirety.

Dated: New York, New York
       June 12, 2020

                         Respectfully submitted,

                         GEOFFREY S. BERMAN
                         United States Attorney of the
                         Southern District of New York

By:                       

                         JENNIFER C. SIMON
                         Assistant United States Attorney
                         86 Chambers Street, Third Floor
                         New York, New York 10007
                         Tel.: (212) 637-2746
                          E-mail: Jennifer.Simon@usdoj.gov